**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **STEWART F. COLLINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 1:06cv0004 RWS** |
| | ) | **TCM** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying

Stewart F. Collins disability insurance benefits ("DIB") under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401-433. Plaintiff has filed a brief in support of his complaint;

the Commissioner has filed a brief in support of her answer. The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

**Procedural History**

Stewart Collins ("Plaintiff") applied for DIB in June 2002, alleging he was disabled

as of May 31, 2002, because of degenerative arthritis, severe left hip pain, low back pain,

bilateral carpal tunnel syndrome, and migraine headaches. (R. at 59-61, 253-54.)[1] This

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

application was denied initially and after a hearing before an Administrative Law Judge ("ALJ"). (Id. at 20, 40-44, 210-35.) After receiving additional medical records, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 2-5.) Plaintiff then filed a § 405 action seeking judicial review of that decision. Collins v. Social Security Administration, 1:04cv0090 RWS E.D. Mo.). On motion of the Commissioner, the case was remanded to the Appeals Council to be returned to the ALJ for further evaluation of Plaintiff's residual functional capacity ("RFC"), an evaluation of third-party statements, and, if necessary, the solicitation of medical expert and vocational expert evidence. (Id. at 312-15.) After a supplemental administrative hearing before ALJ Craig Ellis, Plaintiff's application was again denied. (Id. at 242-88.) The Appeals Council denied review. (Id. at 236-38.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the first administrative hearing.

Plaintiff testified that he had stopped working at the end of May 2002 because of problems with his left leg. (Id. at 213.) Specifically, he had to lift his leg to get into his truck and he was tripping, falling down, and dragging his foot. (Id.) Additionally, he had migraine headaches that caused occasional night chills, carpal tunnel syndrome of several years' duration, a total hip replacement, and back pain. (Id. at 214-16.) With medication,

the headaches were not as severe as before[2] and did not last as long. (Id. at 215.) When he was not in public, he wore a brace on his left arm for the carpal tunnel syndrome. (Id. at 215-16.) He had been advised to have surgery on it, but an operation was not in the budget. (Id. at 215.) Even with his hip replacement, he did not have a full range of motion in his left leg. (Id. at 217.) He could not fully lift or move the leg outward or inward. (Id. at 217-18.) His body leaned to the left and his pelvis was twisted and tilted; consequently, he had back pain. (Id. at 216.) The pain was fairly constant and was a three or four in severity on a ten-point scale. (Id. at 217.) His surgeon had told him not to carry any weight. (Id. at 218.) To relieve the pain, he had to lie down for twenty to twenty-five minutes four or five times a day. (Id. at 219.) His chiropractor had given him exercises to do that also required that he lie down three or four times a day. (Id. at 219-20.) Additionally, he had three toes on his left foot that were always numb. (Id. at 218.) He wore orthotic molds in both shoes to try to even his stance. (Id. at 218-19.) And, Plaintiff's left hand went to sleep. (Id. at 220.)

Plaintiff further testified that he did not see a doctor regularly because of lack of insurance. (Id. at 219.) He took over-the-counter medication for pain. (Id. at 220.)

Plaintiff could not sit in an upright position for longer than 90 minutes and could not stand for longer than "a couple hours." (Id. at 220-21.) He had to alternate between sitting and standing. (Id. at 221.) He could not walk far. (Id.) He no longer walked at night because he could not see the ground. (Id.) Even when walking around the house, he had to

---

[2]Asked to describe the severity of the pain caused by the headaches, Plaintiff testified that on medication they were six to seven on a scale of one to ten, with ten being the worst, and without medication they were twelve to thirteen on a ten-point scale. (Id. at 215.)

be careful about where he stepped so he did not jar his hip or back.  (Id. at 221-22.)  He had difficulty climbing or descending stairs.  (Id. at 222.)  Also, he had to proceed slowly when bending or stooping.  (Id.)

Asked to describe his daily activities, Plaintiff testified that he woke up around 8 o'clock in the morning and went to bed around 11:30 or 12 o'clock at night.  (Id. at 223.)  He usually woke up during the night and had to change positions.  (Id.)  He had to rest during the day.  (Id.)  He did some household chores; for instance, he washed dishes and did the laundry, although both were done with accommodations.  (Id. at 224.)  He did not vacuum, wash windows, mop floors, make beds, take out the garbage, rake leaves, or garden.  (Id. at 225-26.)  He used to garden.  (Id. at 226.)  He could use his riding lawn mower for approximately one hour before his back started to hurt.  (Id. at 225.)  He did not watch television, and seldom listened to the radio.  (Id. at 226.)  He sometimes accompanied his wife on short shopping trips.  (Id.)  He did not belong to any clubs or social organizations and no longer engaged in his former hobbies of hunting and fishing.  (Id. at 228.)  He last went fishing in the summer of 2002.  (Id. at 233.)  He attended church at least once a week. (Id. at 228.)

Plaintiff started seeing a chiropractor when his back and leg problems began.  (Id. at 232.)  His orthopedic surgeon told him his back problems could be relieved by fusing discs. (Id.)  Plaintiff preferred the chiropractor's method of exercising.  (Id.)  He had his hip replacement in July – three months before the hearing – and had had physical therapy

approximately six times.  (Id.)  The therapists told him he was "young enough to do what they told [him] to do" and released him.  (Id. at 233.)

Plaintiff, his wife, Robyn Collins, and a vocational expert, Gary Weimholt, M.S., testified at the supplemental hearing.

Plaintiff testified he was born on October 25, 1957, and was then 47 years' old.  (Id. at 255.)  He was married and lived with his wife and three children.  (Id.)  He had an Associate's degree in automobile mechanics.  (Id. at 256.)  No one in the family had health insurance, including Medicaid.  (Id.)  His wife worked as a counselor.  (Id. at 255.)  Her after-tax income varied but was approximately $2,500 a month.  (Id. at 257.)

Plaintiff last worked managing a ranch that catered to hunters.  (Id.)  He had to stop working at the end of May 2002 because of difficulty lifting his left leg.  (Id. at 258.)  Originally, he was just going to take some time off, but his doctor told him he needed a complete hip replacement.  (Id. at 258-59.)  He had had Perthes disease as a child and was told he would eventually need a hip replacement.  (Id. at 259-62.)  After his surgery, his doctor told him to never get in a cow pen or climb ladders again, effectively ending his ability to do ranch work.  (Id. at 263.)  When his pain did not resolve by the time anticipated, his doctor told him he could fix the problem by fusing Plaintiff's vertebrae together.  (Id. at 264.)  Plaintiff decided to consult a chiropractor instead.  (Id.)  He went to the chiropractor when his left side needed "straighten[ing]."  (Id. at 267.)  Plaintiff paid the chiropractor's charge of $25 out of pocket.  (Id. at 268.)

Plaintiff's day was spent "getting up, walking, laying down, stretching, exercising." (Id. at 265.) Consequently, he could not work at a desk job unless he could "get up and walk around and sit, or lay down." (Id.)

Plaintiff occasionally drove. (Id. at 266.) His sons mowed the lawn. (Id.) Plaintiff was able to bathe and groom himself. (Id. at 273.) Occasionally, he would take a bath in a whirlpool tub they had purchased; the jets helped relieve the pain. (Id.) The farthest walk he took was the 30 yards down to his mailbox and back. (Id. at 275.) He could not carry any weight when walking. (Id.) He could push a grocery cart. (Id. at 276.) He could also follow directions. (Id.) And, his memory, attention, and concentration were fine. (Id.) He would not, however, be reliable in terms of being at a job by a certain time and being able to remain at that job until a certain tine. (Id.)

Everyday Plaintiff had to lie down to relieve his pain, most of which was in his lower back. (Id. at 268, 269.) As in his previous testimony, Plaintiff explained that his chiropractor had recommended exercises that Plaintiff must lie down to do. (Id. at 268.) These exercises took 15 minutes; his chiropractor told him the exercises were working. (Id. at 269, 272.) At its worst, his pain was a ten on a ten-point scale. (Id. at 269.) It was usually a six or six and one-half. (Id.)

The doctor who discussed additional surgery with Plaintiff, see pages 4 and 5, supra, is the doctor who performed the hip surgery. (Id.) Plaintiff had no insurance to pay for a second surgery, and he did not want to "get cut on again." (Id.)

Plaintiff further testified that he had migraine headaches twice a week. (Id. at 277.) His scoliosis gave him pain. (Id.) He did not use any devices, for instance a back brace or crutch, to relieve the pain. (Id. at 277-78.) He was told in the 1990s that he had carpal tunnel syndrome in both hands. (Id. at 278.) This diagnosis was made after he told his doctor that his fingers went to sleep when he drove and did other tasks. (Id.) There were no nerve conduction studies done. (Id.) His doctor told him surgery would probably alleviate the problem. (Id.)

Plaintiff was given sample medications for his migraines. (Id. at 279.) He did not take these on a constant basis, and was not sure if the box he kept in a vehicle was still there. (Id.) His surgeon gave him some pain medication after his hip replacement, but the medication upset his stomach so he threw it out. (Id.) Instead, he rotated between over-the-counter medications. (Id.)

Robyn Collins testified that she had been married to Plaintiff for 27 years. (Id. at 280.) Her husband was no longer able to work because of pain. (Id.) He woke up every night. (Id. at 281.) He did not go to his orthopedist because he had no money. (Id.) He might go in the future if it would help. (Id.) When Plaintiff tried "to do much of anything he has to lay [sic] down. He can't . . . stand up for any length of time." (Id.)

The VE was the next, and last, witness to testify. After describing Plaintiff's past work in terms of skill and physical demands, the VE was asked the following:

> . . . [A]ssume we have a hypothetical individual with the age, education, and work experience of the claimant who could lift, carry, push or pull ten pounds occasionally, less than ten pounds frequently. Sit for six hours

in the course of an eight-hour day, stand or walk a total of two hours in an eight-hour day. Cannot crouch, climb ladders, rope or scaffolds. Has to alternate between sitting and standing every two hours. . . . [W]ould a hypothetical individual with the ages [sic], education, and the work experience of [Plaintiff], who has those restrictions, be able to perform any of the past work that you've identified?

(Id. at 284-85.)  The answer was, "No."  (Id. at 285.)  There were, however, some jobs that such an individual could perform, specifically, jobs of information clerk, referral and information aide, tourist information assistant, night auditor in the hotel/motel industry, cashier at parking garages, cafeterias, and other services, and some simple assembly jobs. (Id. at 285-86.)  If the need to alternate between sitting and standing every two hours was replaced with the need to sit or stand at will, thereby more frequently shifting positions, the jobs that could accommodate such restrictions would be narrowed to information clerk and cashier positions.  (Id. at 286.)  If the hypothetical person also needed to lie down fifteen minutes four times during the work day, there were no jobs that he or she could perform.  (Id. at 287.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, and the report of a consultant.

Soon after applying for DIB, Plaintiff completed a questionnaire in August 2002 about how his symptoms affected his ability to work and his activities of daily living.  (Id. at 90-93.)  He reported that pain in his left hip, left foot, and lower back prevented him from

walking, standing, sitting, or lying down for an extended period. (<u>Id.</u> at 90.) Other than taking medication prescribed by Dr. Dickson or over-the-counter medication, Plaintiff lay down to relieve the pain. (<u>Id.</u>) The only side effect from his medications was drowsiness. (<u>Id.</u>) He had difficulty staying asleep because of muscle spasms and had trouble dressing. (<u>Id.</u> at 91.) He could not bend over, and consequently had difficulty preparing meals or doing any household chores. (<u>Id.</u>) On a supplemental questionnaire completed the same day, he reported that he participated in physical therapy twice a week. (<u>Id.</u> at 88.) He could not lift anything heavier than 20 pounds, could not bend over, and had to use a walker or cane. (<u>Id.</u>)

On a Disability Report, Plaintiff listed 1968 as the year in which his impairments first caused him pain and May 31, 2002, as the date when he stopped working because of his surgery, follow-up care, pain, and limited mobility. (<u>Id.</u> at 104.) His doctors included Dr. Glenn Dickson, who was to perform the hip replacement surgery on July 11, and Dr. D.L. Davis, who had last seen him in January 2002 and who had prescribed medicine, Imitrex, for his migraines, prescribed a brace for his carpal tunnel syndrome, and who had told him he would need surgery in the future. (<u>Id.</u> at 106.) He had also seen a Dr. S.L. Gernstetter for his hip problems. (<u>Id.</u> at 107.) He had last seen this doctor in the 1980s. (<u>Id.</u>)

The few medical records before the ALJ begin with those of Sam A. Mickey, D.C.

Plaintiff first consulted Dr. Mickey in April 1993 for chiropractic treatment for headaches, chills, and hip pain. (<u>Id.</u> at 126-30, 135-37.) His gait was described as irregular, his posture as fair. (<u>Id.</u> at 129.) Plaintiff reported that his doctor had told him he had

migraines.  (Id. at 126.)  He had had them for at least ten years and they caused him to miss one or two days of work a year.  (Id.)  They did not interfere with his normal work or daily routine.  (Id.)  When they occurred, the pain was a ten.  (Id.)  One month later, Plaintiff reported that he was doing well.  (Id. at 125.)  He had had a recent headache caused by eating too much chocolate.  (Id.)  In June, he reported having mild headaches.  (Id.)  The next month, he again had a headache after eating chocolate.  (Id.)  In a Patient Progress Questionnaire completed that same month, Plaintiff reported that his migraines, sore arm joints, nausea, and numbness in his left heel were much better.  (Id. at 131.)  His sore left hip joint, numbness in his fingers, and pain down his left leg were somewhat better.  (Id.)  His irritability was the same.  (Id.)  On a ten-point scale, his pain was a two or three.  (Id.)  It was easier for him to walk, work, sit, sleep, ride, and stand.  (Id. at 132.)  And, he described himself as feeling well.  (Id.)  At his first September visit, he had no symptoms and had had no headaches since July.  (Id. at 125.)  Another Patient Progress Questionnaire was completed in December after additional chiropractic treatments.  (Id. at 133-34.)  Four symptoms were listed; the others were described as being abated.  (Id. at 133.)  His sore left hip joint and the numbness in his fingers were the same; his left leg pain and headaches were somewhat better.  (Id.)  He did not rate his pain.  (Id.)  Asked if he had engaged in activities that were prohibited or limited, he replied that there had been no limitations.  (Id.)  Between December 1993 and November 1994, Plaintiff had eight chiropractic treatments.  (Id. at 123-24.)  In November, he missed an appointment because he was on vacation in Arkansas hunting.  (Id. at 123.)  He missed his next two appointments, explaining that he was too busy

to reschedule.  (Id.)  He had two treatments in April 1995, one in May, and one in June.  (Id.)

In August, he reported that he was feeling good.  (Id.)  He was next, and last, seen in

November 1999 for complaints of numbness in his left hand.  (Id. at 123, 138.)

Almost two years later, in October 2001, Plaintiff consulted D. L. Davis, M.D. about

headaches preceded by chills and lasting into the next day.  (Id. at 147.)  He reported that the

headaches were not identified with any particular foods.  (Id.)  Dr. Davis diagnosed the

headaches as migraines and prescribed Imitrex.  (Id.)

On June 6, 2002, Plaintiff consulted Glenn E. Dickson, M.D., reporting that he had

had difficulty with his left hip after jumping off a 12-foot wall as a child.  (Id. at 157.)  He

had progressive hip pain, and was having difficulty getting around.  (Id.)  The diagnosis was

osteoarthritis; the recommendation was a total hip replacement.  (Id. at 158.)  Dr. Dickson

informed Plaintiff that, because of his young age, he would have to have the replacement

revised at some point.  (Id.)  The total hip replacement was performed on July 11.  (Id. at

156, 199-200.)  Plaintiff was discharged on July 14, and began physical therapy on July 16.

(Id. at 175-77, 195-96.)  At that point, he had pain that was a five or six on a ten-point scale.

(Id. at 177.)  At his July 18 physical therapy session, Plaintiff tolerated the treatment well

but complained of muscle spasms during the night; his physician was to prescribe muscle

relaxants.  (Id. at 171.)  At his July 23 session, he had minimal complaints of pain.  (Id. at

169.)  On July 26, however, he had complaints of pain in his lower left leg and foot.  (Id. at

167.)  Plaintiff's last reported session was on August 2.  (Id. at 163.)  He was described as

"doing better."  (Id.)

Five days later, Plaintiff was seen by Loren Smothers, D.C., for low back and foot pain. (Id. at 122, 159-61, 336-37.) Dr. Smothers noted that the treatment – manipulative adjustments of his spine – would be for relief from his symptoms and not for correction of the problem. (Id. at 122, 159, 336.)

Following an office visit on January 27, 2003, Dr. Dickson noted Plaintiff's concern with his leg lengths. (Id. at 120, 142.) An examination revealed that his legs were exactly the same length within one millimeter. (Id.) Plaintiff did have moderate scoliosis in his lumbar spine with associated degenerative arthritis. (Id.) Dr. Dickson opined that Plaintiff would have difficulty with his back, "especially if he tries to carry out an occupation that will require much standing, walking, or carry a heavy load." (Id.) At Plaintiff's next visit five months later, he complained of some back pain. (Id. at 120.) Dr. Dickson described Plaintiff's hip as "doing very well." (Id.) There was no evidence of loosening or wear. (Id.)

Between the two office visits, Dr. Dickson completed a questionnaire at the request of Plaintiff's attorney. (Id. at 140-41.) He listed one problem – scoliosis – as being present as of January 27, 2003, and concluded that Plaintiff would have progressive problems with his back. (Id.) Asked if Plaintiff would be able to engage in substantial employment with his hip and back problems, Dr. Dickson gave a one-word answer, "No." (Id. at 141.) He then explained that "most any work would make [Plaintiff's] back worse." (Id.)

On October 11, 2002, one year after the only visit included in the record, Dr. Davis completed a questionnaire sent him by the Missouri Section of Disability Determinations ("DDS"). (Id. at 144-45.) Dr. Davis reported that Plaintiff should never do any bending,

stooping, prolonged sitting or standing, or lifting of any weight heavier than 20 pounds. (Id. at 144.) Dr. Davis opined that Plaintiff would see little if any improvement in his back and that the treatment would be pain management and lifestyle modifications. (Id.) Plaintiff's degenerative disc disease and scoliosis would require that he frequently alternate between sitting and standing. (Id. at 145.) On the other hand, Plaintiff's foot pain had improved and would probably continue to do so. (Id.) Plaintiff's gait was antalgic due to his lower back problems. (Id.) Dr. Davis concluded that Plaintiff was unable to perform any "significant" activities or to sit or stand for any "significant" time. (Id.)

The same questionnaire was completed by Dr. Dickson. (Id. at 150-51.) Dr. Dickson was unable to comment on Plaintiff's back because he had not evaluated it. (Id. at 150.) He did conclude that Plaintiff would need to alternate between sitting and standing every two hours. (Id.) A month earlier, Dr. Dickson had reported to DDS that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently, stand and walk at least two out of eight hours, sit six out of eight hours, and stoop occasionally. (Id. at 153.) These restrictions were imposed postoperatively following his total hip replacement. (Id.)

A scoliosis evaluation of Plaintiff was performed in October 2003 by Tom Brumitt, D.O. (Id. at 118.) The impression was of a mild dorsal dextroscoliosis and severe lumbar levorotoscoliosis with lower lumbosacral intervertebral osteochondrosis as represented by prominent disc and facet degenerative disease. (Id.) An x-ray of Plaintiff's pelvis revealed a moderate pelvic tilt and rotation in association with left hip prosthesis and severe scoliosis of lumbar spine; sacroiliac joint degenerative changes of moderate severity on the right and

mild severity on the left; and mild degenerative arthritic disease affecting the right hip joint.

(Id. at 119.)

James A. Mertz, D.C., in Albuquerque, New Mexico, reviewed x-rays of Plaintiff's spine[3] in March 2005. (Id. at 333-34.) He concluded as follows:

1.      [Plaintiff's] moderate degenerative disc disease and spondylarthrosis at L 4-5 and at L5-S1, the zygapophyseal joint arthrosis extending caudally from L 3-4 and the cervical spinal dextrorotoscoliosis are unchanged from the previous examination.
2.      The thoracolumbar spinal levorotoscoliosis and the pelvic unlevelling toward the low left side have been reduced approximately 50%.
3.      The cervical spinal hypolordosis is attributed to paraspinal muscular imbalance.
4.      Degenerative disc disease and spondylarthrosis are also present at C 6-7.
5.      The facet tropism at L 1-2 and 2-3 is an unstabling factor at the thoracolumbar junction.
6.      There is a spina bifida occulta at S 1.

The ALJ also had before him the October 2002 Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff by a State agency consultant, G. Diemer, M.D. (Id. at 78-86.) The primary diagnosis was degenerative arthritis of the left hip; the secondary diagnosis was lumbar scoliosis. (Id. at 78.) These impairments resulted in exertional limitations of being able to occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk for at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Id. at 79.) Plaintiff was limited in his ability to push or pull in his lower extremities. (Id.) He had several postural limitations, including an inability to more

_____

[3]It appears from the record that these x-rays are the ones taken by Dr. Smothers in August 2002.

than occasionally, or less than one-third of the time, climb ramps or stairs, stoop, kneel, crouch, or crawl and was never to climb ladders, ropes, or scaffolds. (Id. at 81.) He had no manipulative, visual, environmental, or communicative limitations. (Id. at 82-83.)

## The ALJ's Decision

After review of the record, the ALJ found that Plaintiff was status post total hip replacement and had advanced osteoarthritis of his left hip secondary to Legg-Calve'-Perthes disease and also had scoliosis and degenerative disc disease in his lumbar spine; these impairments produced limitations which were severe. (Id. at 243.) There was no evidence, however, that Plaintiff's carpal tunnel syndrome or migraine headaches were severe. (Id.)

After summarizing Plaintiff's and his wife's descriptions of his functional limitations, the ALJ found that the objective findings did not support their allegations. (Id. at 244.) The ALJ next summarized the medical evidence, noting that observations of a chiropractor may be helpful in understanding how an impairment affects a claimant's ability to work. (Id. at 244-45.) Dr. Mertz's records, however, were not helpful. (Id. at 245.) The opinion of the State medical consultant was also not of controlling weight, "but must be considered and weighed as those of [a] highly qualified physician[] who [is an] expert[] in the evaluation of medical issues under the Social Security Act." (Id.) This opinions was that Plaintiff could occasionally lift and carry ten pounds, frequently lift and carry less, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull using the upper extremities. (Id.) This opinion was, the ALJ concluded, consistent with the record and entitled to substantial weight. (Id.)

Moreover, Plaintiff "ha[d] not generally received the type of medical treatment one would expect for a totally disabled individual." (Id.) He had undergone hip surgery in 2002, but had not sought or received any treatment since 2003. (Id.) He had not sought any treatment for pain relief, had not had any treatment for or complaints of migraine headaches after 2001, and had no medical evidence documenting carpal tunnel syndrome. (Id. at 246.) He took no medication for his allegedly disabling symptoms. (Id.)

The ALJ further noted the lack of any display of disabling pain or discomfort during the hearing. (Id.) And, there was no objective evidence to support the restricted daily activities or disabling functional limitations described by Plaintiff. (Id.) Also noting that Plaintiff's work record was a positive factor in assessing his credibility, the ALJ concluded that Plaintiff's subjective complaints were not fully credible and were not consistent with the medical evidence of record. (Id. at 246-47.)

The ALJ next considered the testimony of Plaintiff's wife, finding it sincere but dependent on the subjective complaints of her husband. (Id. at 247.)

Plaintiff had the RFC defined by the State agency consultant and a need to alternate every two hours between sitting and standing. (Id.) This RFC precluded his return to his past relevant work, but did not preclude him for performing certain jobs defined by the VE and existing in significant numbers in the national economy. (Id. at 247-48.) Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 248.)

**Legal Standards**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. § 404.1520. <u>See also</u> **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." <u>Id.</u> (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or

combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included

in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.

**Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet her burden by eliciting testimony by a VE. **Pearsall**, 274 F.3d at 1219. If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's

decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, specifically (1) the ALJ's RFC assessment did not consider Dr. Dickson's 2003 opinions or Dr. Davis's report, (2) the ALJ's hypothetical question to the VE did not fully describe Plaintiff's impairments, including his need to lie down four times a day, and (3) the ALJ's assessment of Plaintiff's credibility is contradicted or not supported by the record, including his lack of financial resources to seek medical treatment, and does not cite other, relevant considerations, including his ability to comply with a regimen of prescription medications. The Commissioner disagrees.

The ALJ's RFC Assessment. As noted above, the ALJ has the duty of "'determin[ing] a claimant's RFC based on all the relevant evidence, including the medical records,

observations of treating physicians and others, and an individual's own description of his limitations[,]'" **Lacroix**, 465 F.3d at 887 (quoting <u>Strongson</u>, 361 F.3d at 1070) (alterations added), and the claimant has the burden of establishing his RFC, **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005). The ALJ does not have the duty, however, to include in the RFC limitations described by sources the ALJ finds are not supported by the evidence or not entitled to the enhanced weight normally accorded the opinions of treating physicians. <u>See</u> **Lacroix**, 465 F.3d at 887-88; **Prosch v. Apfel**, 201 F.3d 1010, 1013 (8th Cir. 2000).

Asked in April 2003, if Plaintiff would be able to engage in substantial, gainful employment with his hip and back problems, Dr. Dickson replied, "No." He further explained that "most any work" would make Plaintiff's back worse. It was at Plaintiff's last office visit, four months before the question was posed and seven months after his disability onset date, that Plaintiff first complained to Dr. Dickson of back problems.[4] Dr. Dickson's inquiry into those problems consisted of reviewing x-rays films taken by Plaintiff's chiropractor. At his next office visit, one month after the question was posed, Plaintiff's replaced hip was described as doing very well. Plaintiff complained of "some" back pain. The notes from this office visit are four sentences in length – one brief paragraph.

Diagnosis and impressions "based largely on [a claimant's] subjective complaint with little objective medical support" need not be given controlling weight. <u>See</u> **Vandenboom v.**

---

[4]Noting that he had never evaluated Plaintiff's back, Dr. Dickson had been unable to complete a questionnaire in October 2002 about the extent to which Plaintiff's back problems hindered his ability to work.

**Barnhart**, 421 F.3d 745, 749 (8th Cir. 2005). Moreover, RFC assessments that are general, incomplete, or conclusory need not be given controlling weight. **Stormo v. Barnhart**, 377 F.3d 801, 805-06 (8th Cir. 2004); **Holmstrom v. Massanari**, 270 F.3d 715, (8th Cir. 2001). Dr. Dickson's assessment that Plaintiff's back problems would preclude gainful employment is vague and conclusory. He was not treating Plaintiff for back problems; indeed, Plaintiff had complained to him of back problems only after filing for DIB and only at the visit preceding the questionnaire. Other than the x-rays, which do not alone support a conclusion of debilitating back problems, there is no indication in Dr. Dickson's notes that he examined Plaintiff's back or had any longitudinal picture of any back problems. Insofar as Dr. Dickson opined that Plaintiff's back problems would hinder his ability to work at a job that would require "much standing, walking, or carry[ing of] a heavy load," those limitations are consistent with the ALJ's RFC findings.[5] Insofar as Dr. Dickson concluded that Plaintiff could not engage in substantial employment, that is a conclusion that impermissibly invades the province of the ALJ. See **Vandenboom**, 421 F.3d at 750. Thus, the ALJ did not err in his treatment of Dr. Dickson's opinions when assessing Plaintiff's RFC. See **Id.** (affirming ALJ's failure to give controlling weight to opinion of claimant's treating neurologist; opinion was inconsistent with medical record and did not include documentation of objective medical evidence to support claimant's subjective complaints).

_____

[5]Limitations described in September 2002 by Dr. Dickson are also consistent with the ALJ's RFC findings, e.g., Plaintiff could lift ten pounds occasionally and less than ten pounds frequently.

Plaintiff further argues that the ALJ erred by not including Dr. Davis's opinions in his RFC findings. As with Dr. Dickson, several of the limitations described by Dr. Davis were included in the RFC, for instance, Plaintiff's need to avoid bending and stooping. Other limitations were conclusory and vague; for instance, Plaintiff was unable to perform any "significant" activities or sit or stand for any "significant" time. The reasons supporting the ALJ's consideration of Dr. Dickson's opinions when determining Plaintiff's RFC are equally applicable to Dr. Davis's opinions. Indeed, they are stronger in the case of Dr. Davis, who saw Plaintiff only once and then for a condition, migraine headaches, which was not cited by Dr. Davis as a limiting impairment. See, e.g., **Stormo**, 377 F.3d at 806 (affirming ALJ's rejection of one treating physician's statement that claimant's problems made it difficult for him to sustain employment and other treating physician's statement that claimant's alleged limitations were not unusual for someone with claimant's medical history; first statement was inappropriate legal conclusion and second was speculative and conditional).

Hypothetical Question to VE. "[T]estimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997) (alteration added). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff**, 421 F.3d at 794; **Haggard v.**

**Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

In the instant case, the ALJ included only those limitations that he found supported by the record, giving Plaintiff the benefit of the doubt on any specific functional limitations. The additional limitations Plaintiff contends should have been included depended on the ALJ positively assessing his credibility. As discussed below, that credibility assessment was not error; consequently, the ALJ's hypothetical question to the VE was proper. See **Strongson**, 361 F.3d at 1073 (concluding that ALJ's hypothetical question properly included only the impairments the ALJ found credible); **Harris v. Barnhart**, 356 F.3d 926, 930 (8th Cir. 2004) (finding no error in ALJ's hypothetical question to VE that did not include limitations described by claimant on grounds that ALJ had also not erred in discounting those limitations); **Pearsall**, 274 F.3d at 1220 (rejecting challenge to hypothetical question that did not include limitations found by treating physician that were properly discounted by ALJ).

Plaintiff's Credibility. In his final argument, Plaintiff contends that the ALJ's assessment of his credibility is either contradicted by or not supported by the record, including his lack of financial resources to seek medical treatment, and does not cite other, relevant considerations.

As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. See also **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006) (noting that ALJ had to assess claimant's credibility before determining his RFC). "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972).

In the instant case, after summarizing the medical evidence, the ALJ considered Plaintiff's subjective complaints and discounted them based on several Polaski factors, including the lack of supporting objective evidence. "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (quoting Ramirez, 292 F.3d at 581 (alterations in original). Accord **Strongson**, 361 F.3d at 1072; **Baldwin v. Barnhart**, 349 F.3d 549, 558 (8th Cir. 2003). See also **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

Another proper consideration is the lack of treatment sought or medication taken by Plaintiff.  See **Gonzales**, 465 F.3d at 895 (affirming ALJ's credibility assessment of claimant who alleged debilitating back pain but who had failed to pursue alternative treatments, e.g., surgical intervention or back brace, to alleviate such pain); **Choate**, 457 F.3d at 872 (finding that ALJ properly considered claimant's failure to seek treatment or take prescription medications when assessing credibility); **Dukes**, 436 F.3d at 928 (affirming ALJ's negative assessment of claimant's credibility based, in part, on absence of hospitalizations, limited treatment of symptoms, and failure to diligently seek medical care).  These omissions are particularly relevant in light of Plaintiff's report that physicians have told him that his pain can be alleviated by treatment and his preference to pursue chiropractic treatment rather than surgery.

Plaintiff contends that the lack of treatment and medication is result of his financial inability to pay for either.  A lack of sufficient financial resources to follow prescribed or recommended treatment to remedy a disabling impairment may be "justifiable cause" for such noncompliance.  **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004).  In order to be such cause, there must be evidence that the claimant was denied medical treatment due to financial reasons.  **Goff**, 421 F.3d at 793.  See also **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay).  Such evidence is lacking in the instant case.

Although Plaintiff testified that he had been denied Medicaid, he did not testify that he had ever been denied medical treatment because of an inability to pay.[6] Moreover, he paid for chiropractic treatment and a new whirlpool. In **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999), the Eighth Circuit Court of Appeals rejected a similar reason for the absence of medical treatment or prescription medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."

Another factor the ALJ considered as weighing against Plaintiff's credibility was the ALJ's observation that Plaintiff did not display any discomfort or pain during the hearing.[7] As noted by the Commissioner, "[t]he ALJ's personal observations of the claimant's demeanor during the hearing is [sic] completely proper in making credibility determinations." **Johnson**, 240 F.3d at 1147-48 (alteration added).

---

[6]Plaintiff also testified that the hospital bill for his hip replacement surgery had been paid in part by a Missouri agency and the remainder had been forgiven by the hospital and that the surgeon had referred his bill to a collection agency. Plaintiff did not testify, however, that he had sought further treatment and had been refused such because of an inability to pay. Indeed, he consulted the surgeon, Dr. Dickson, twice in 2003 and Dr. Dickson had completed a questionnaire on his behalf. Moreover, Plaintiff also testified that he had not pursued the recommended treatment because of his preference for chiropractic treatment.

[7]The undersigned also notes that there were inconsistencies in the record detracting from Plaintiff's credibility. For instance, he testified that he wore orthotic molds in his shoes to even his stance yet Dr. Dickson found his leg lengths were equal within one millimeter. He testified at the first hearing that he used a brace for the carpal tunnel syndrome; he testified at the second hearing he used a crutch or walker; he reported on a form that he used no assistive devices.

Plaintiff's wife supported his description of his limitations; however, this does not require a finding that his testimony was credible.[8] See **Choate**, 457 F.3d at 872 (finding that the ALJ properly assessed claimant's wife's testimony; wife's testimony was similar to claimant's and added little information, "particularly in light of her interest in the outcome"). Nor does Plaintiff's work record, acknowledged by the ALJ to be positive, require a favorable credibility finding in light of the other factors detracting from such. See **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006) (affirming ALJ's negative credibility assessment and noting that ALJ had acknowledged claimant's excellent work record).

An ALJ's credibility determination is not to be disturbed if the claimant's complaints of disabling pain are considered but are expressly discredited for good cause. **Goff**, 421 F.3d at 792. For the reasons set forth above, good cause exists for the ALJ's determination as to Plaintiff's credibility.

## Conclusion

For the foregoing reasons, the Court finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

---

[8]Plaintiff also submitted a letter from his pastor confirming Plaintiff's limited activities. The dispute, however, is not whether Plaintiff engages in limited activities, but is whether those limitations are the result of established, severe impairments.

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.  See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of January, 2007.